AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

**11/12/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT

**11/12/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ bm _____ DEPUTY

United States of America

v.

DOUGLAS ANTHONY PINEDA,

Defendant.

Case No.   2:24-MJ-06839-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of March 5, 2024 in the County of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |
| 18 U.S.C. § 922(g)(1) | Prohibited Person in Possession of a Firearm |
| 18 U.S.C. § 924(c) | Possession of a Firearm in Furtherance of a Drug Trafficking Crime |
| 26 U.S.C. § 5861(d) | Possession of an Unregistered Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Stephanie R. Crebbs*
Complainant's signature

Stephanie R. Crebbs, ATF Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    11/12/2024

Judge's signature

City and state:   Los Angeles, California

Jean P. Rosenbluth, U.S. Magistrate Judge
Printed name and title

AUSA: Jason A. Gorn

### **AFFIDAVIT**

I, Stephanie Crebbs, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Douglas Anthony PINEDA for violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) 18 U.S.C. § 922(g)(1) (prohibited person in possession of a firearm), 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime), and 26 U.S.C. § 5861(d) (possession of an unregistered firearm).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Los Angeles County Sheriff's Department, in Whittier, California, as described more fully in Attachment A:

      a.    An Apple iPhone ("SUBJECT DEVICE 1");

      b.    A Samsung cell phone ("SUBJECT DEVICE 2");

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 846 (possession with intent to distribute controlled substances and conspiracy to do the same), 18 U.S.C. § 922(g) (prohibited person in possession of a firearm), 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime), and 26 U.S.C. § 5861(d) (possession of an unregistered firearm) (the "Subject

Offenses"), as described more fully in Attachment B.
Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses. This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrant, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only, all amounts and weights are approximate, and
all dates and times are on or about those indicated.

## II. **BACKGROUND OF AFFIANT**

5.    I am a sworn Special Agent with the United States
Department of Justice, Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF") and have been so employed since February
2009. I am currently assigned to the ATF Long Beach Field
Office. As a Special Agent, I have received hundreds of hours of
formal and informal training in the enforcement of federal
firearms laws and regulations, including training at the ATF
National Academy and Federal Law Enforcement Criminal
Investigator Training Program.

6.    Working for ATF, I have conducted investigations into
the unlawful sale, possession, manufacturing, transportation,
and importation of firearms. In conducting these investigations,
I have used a variety of investigative techniques, including

2

surveillance and the execution of search and arrest warrants. Additionally, I have worked in an undercover capacity for ATF on investigations related to individuals selling firearms.

7.    Through my training and experience, I am familiar with the ways in which prohibited persons possess and traffic illegal firearms and narcotics, including the use of vehicles to meet with accomplices and to collect, transport, and distribute illegal firearms and narcotics and the use of digital devices to coordinate such activities.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    From December of 2023, through March of 2024, LASD Detectives intercepted and monitored the telephonic communications for a telephone line being utilized by PINEDA. LASD intercepted and monitored several calls with individuals where PINEDA would arrange the sale of large quantities of narcotics and firearms.

9.    On March 5, 2024, LASD Detectives surveilled PINEDA's residence. There, they observed an individual ("Individual A"[1]), arrive in a car, open the gate, and back the car to the rear of the property.  Investigators observed PINEDA, a̶ another Hispanic male (believed to be a family member of PINEDA), and Individual A, meet at the trunk of Individual A's car. It appeared as if PINEDA and Individual A were inspecting the trunk of the car. After several minutes Individual A drove off in his/her car.

10.    Investigators surveilled Individual A away from the area.  Assisted by a LASD patrol unit, a traffic stop was

---

[1] The identity of Individual A is known to law enforcement.

conducted of Individual A. During the traffic stop, deputies recovered and seized approximately one pound of cocaine and several ounces of methamphetamine. Subsequently, LASD obtained a state search warrant for PINEDA's residence.

11.   Pursuant to a state search warrant, LASD searched PINEDA's residence. In PINEDAS's residence, LASD found nine pistols, one shotgun, numerous plastic bags of methamphetamine in various places in the front room totaling approximately 61 pounds, one half kilogram of powdered cocaine wrapped in green plastic wrap recovered from the couch, two kilograms of fentanyl powder wrapped in red packaging, clear plastic bindles containing approximately 5,000 blue M30 Fentanyl pills totaling 617.58 grams, clear plastic bindles containing powdered fentanyl totaling approximately 66 grams, clear plastic bindles containing heroin totaling approximately 72.78 grams, and approximately $25,700 cash.

12.   In the detached garage area of PINEDA's residence, law enforcement recovered and seized 27 pistols, four AR/AK style pistols, 16 rifles including short-barreled rifles, five silencers, and thousands of rounds of ammunition.

13.   55 of the 57 total firearms seized from PINEDA have been analyzed and confirmed to have been manufactured outside of the state of California. PINEDA has previously been convicted of a felony crime punishable by more than one year in prison and consequently is prohibited from possessing firearms and ammunition.

## IV.    STATEMENT OF PROBABLE CAUSE

14.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    LASD Conducts a State Wiretap Investigation on PINEDA**

15.  Based on my conversations with LASD Detectives and Deputies, my review of law enforcement reports and affidavits, and my review of photographs, body worn camera evidence and my physical examination of seized evidence, I am aware of the following:

a.    From December of 2023, through March of 2024, Los Angeles County Superior Court Judge Larry P. Fidler signed and authorized the continued use of interception of wire and communications for multiple telephone lines involved in narcotics and firearms trafficking. LASD Detectives intercepted and monitored the telephonic communications for a telephone line believed to be utilized by PINEDA in Los Angeles, CA. LASD intercepted and monitored several calls with individuals where PINEDA would arrange the sale of large quantities of narcotics and firearms.

b.    Specifically, on March 4, 2024, at approximately 11:09 a.m., an individual identified as Gilbert Felix GUYTAN ("GUYTAN") placed an outgoing call to PINEDA. During the conversation, PINEDA asked GUYTAN how the "pills" (fentanyl) were and how many they (customer) want. GUYTAN told PINEDA he (GUYTAN) would find out, but they want "everything", "the black" (heroin), "pills" (fentanyl), "pistols" (firearms), "China

white" (heroin) and "fetty" (fentanyl). PINEDA told GUYTAN he (PINEDA) would make some calls.

   **B.    LASD Surveillance of PINEDA's Residence**

   16.  On March 5, 2024, based on intercepted conversations, law enforcement established surveillance at PINEDA's residence in Los Angeles to observe transactions conducted by PINEDA.

   17.  Law enforcement surveillance and GPS data obtained through a state search warrant indicated that PINEDA was not at the location. At approximately 12:45 p.m., Detective Yoshida observed PINEDA arriving at the location driving a gray 2014 Toyota Camry bearing California license plate ending in 749. PINEDA, the sole occupant, parked the vehicle in the driveway and opened the gate. Within less than a minute, a Hispanic female adult entered the front passenger side of the vehicle, as PINEDA re-entered the driver's seat. Both drove away from the location. Data mapping provided from the wire intercepts of PINEDA's phone indicated the device was traveling with the vehicle as GPS data information coincided with the movement.

   18.  At approximately 3:06 p.m., PINEDA returned to his residence in the Toyota, opened the gate and pulled into the property and out of view. GPS data for PINEDA's phone coincided with PINEDA's return. At approximately 3:30 p.m., GUYTAN indicated in an intercepted wire communication that he (GUYTAN) was in the area of PINEDA's location.

   19.  On March 5, 2024, at approximately 3:51 p.m., Individual A arrived in a white Honda. Surveillance units saw Individual A open the gate and back the Honda to the rear of

PINEDA's residence. Investigators observed PINEDA and an unidentified male Hispanic (UMH) meet at the trunk of the Honda. Individual A, along with PINEDA and the UMH, appeared to be inspecting the trunk of the Honda. After several minutes Individual A drove off in the Honda. Investigators observed the UMH exit the property and begin pacing the block. The UMH was checking the neighborhood and peering through car windows. Investigators believed the UMH was conducting counter-surveillance to see if law enforcement was in the neighborhood. The UMH returned to the property and entered PINEDA's residence as PINEDA disappeared to the rear of his residence.

20. Surveillance units requested the assistance of a South Los Angeles patrol unit, who conducted a traffic stop of Individual A. During the traffic stop, Deputies recovered and seized approximately one pound of cocaine and several ounces of methamphetamine.

### C.    Individual A's Statements

21. Individual A told Deputies he/she observed surveillance and was attempting to evade surveillance but was stopped by the patrol unit. LASD Detective J. Moore spoke to Individual A, who told him that he/she (Individual A) was at PINEDA's residence brokering a narcotics transaction for PINEDA. Individual A said he/she was there to deliver narcotics for a transaction that PINEDA was conducting with another person unknown to Individual A.

22.  Based on the wire intercepts, surveillance and statements of Individual A, LASD Detectives obtained a search warrant for PINEDA's residence.

**D.  Search of PINEDA's Residence and Car Reveals 57 Guns, Silencers, Thousands of Rounds of Ammunition, Drugs, and the SUBJECT DEVICES**

23.  Based on my conversations with Detectives Carrillo and Moore, my review of law enforcement reports and affidavits, and my review of the state search warrant described below, I am aware of the following:

24.  On March 5, 2024, the search warrant for PINEDA's residence was signed and authorized by Los Angeles County Superior Court Judge Margaret Bernal.

25.  Investigators maintained surveillance at PINEDA's residence. During surveillance, PINEDA was observed leaving his residence and was followed by surveillance. Based on the search warrant, a traffic stop was conducted of PINEDA and he was detained.

**E.  PINEDA's Mirandized Statements**

26.  Detectives Saucedo and Moore contacted PINEDA in the rear seat of the patrol vehicle. Detective Moore read PINEDA his Miranda rights. PINEDA told Detective Moore he understood his rights and agreed to speak to him without an attorney present. PINEDA told Detective Moore that he resides at 180 East 47th Place, Los Angeles, CA in the rear residence (identified as 178 East 47th Place) with his wife and two daughters. PINEDA's parents and brother live in the front residence. PINEDA told Detective Moore that he and his wife sleep in the front room

(living room) and his daughters sleep in the rear bedroom.
PINEDA told Detective Moore that he had several firearms in his
residence. PINEDA said there was a shotgun in a box on the
living room floor, and three pistols, two in boxes on the floor
and the other on the couch underneath some clothes. PINEDA also
said there was also approximately 10 pounds of methamphetamine,
approximately 3,000 fentanyl pills, ½ kilo of cocaine, 2 kilos
of fentanyl, and 2 "pieces" (ounces) of heroin. During the
questioning, PINEDA originally was very vague on the amounts of
firearms and narcotics. As the conversation progressed, PINEDA
continued to add information about the total amounts of each.
PINEDA told Detective Moore there was nothing illegal in the
front residence and that his family in the front residence had
nothing to do with firearms or narcotics. PINEDA was in
possession of the SUBJECT DEVICES at the time of the traffic
stop. The SUBJECT DEVICES were seized by LASD as evidence.[2]

27.  After PINEDA was detained and interviewed,
investigators responded to the location to execute the search
warrant. Detective Moore along with other investigators
conducted a search of the PINEDA's residence. A substantial
amount of narcotics, narcotics proceeds, weapons and other
narcotics indicia were seized including:

       i.    Approximately $25,700 of U.S. Currency;

      ii.   A black Kel-Tec 12 Gauge shotgun;

---

[2] Per LASD, after the seizure of these SUBJECT DEVICES, LASD
continued to receive wire communications from PINEDA regarding
narcotics activity.

iii. A black and chrome Smith and Wesson Semi-automatic pistol;

iv.  A black Bersa Piccola AT Thunder Semi-Automatic pistol;

v.  A black and chrome Smith and Wesson Semi-Automatic pistol;

vi.  A black and grey Springfield Armory Model XD Semi-Automatic pistol;

vii. A green and black Glock Model 19 Semi-Automatic pistol;

viii.   A black and turquoise ACZ Model Semi-Automatic pistol;

ix.  A grey and black Smith and Wesson Model SW40VE Semi-Automatic pistol;

x.  A black Beretta Model PX4 Storm Semi-Automatic pistol;

xi.  A chrome and black Springfield Armory Model XD45LE Semi-Automatic pistol;

xii. A sample of methamphetamine totaling approximately 957.13 grams;

xiii.   17 packages each containing methamphetamine totaling approximately 8,683 grams;

xiv. 4 packages each containing methamphetamine totaling approximately 18,160 grams;

xv.  A half kilogram of powdered cocaine wrapped totaling approximately 546.37 grams;

xvi. Two packages of fentanyl powder totaling approximately 2,234 grams;

xvii.    Clear plastic bindles containing approximately 5,000 blue M30 Fentanyl pills totaling approximately 617.58 grams;

xviii.    Clear plastic bindles containing powdered fentanyl totaling approximately 66 grams;

xix. Clear plastic bindles containing heroin totaling approximately 72.78 grams.

28.  LASD Detectives also located a scale, a currency counter and a document from "AAA" with PINEDA's information on it.

29.  In the detached garage, LASD Detectives Yoshida, Reyes and Saucedo located and collected the following items from the garage including:

i.    A grey Smith and Wesson Model M&P 2.0 Semi-Automatic pistol;

ii.    A black and grey Sig Sauer Model 1911 Semi-Automatic pistol;

iii. A CZ Model CZ75B 9mm Semi-Automatic pistol;

iv.    A black Pietro Beretta Model 96A1 Semi-Automatic pistol;

v.    A tan FN-FAL BG Model Five Seven Semi-Automatic pistol;

vi.    A black Gersan TY Model Regard MC Semi-Automatic pistol;

vii. A black Smith and Wesson Model M&P Semi-Automatic pistol;

viii.    A black Glock Model 23 Semi-Automatic pistol;

ix.  A black Bersa Picola Model Thunder 380 Semi-Automatic pistol;

x.   A black Taurus Model G2C Semi-Automatic pistol;

xi.  A black Smith and Wesson Model Airweight Revolver;

xii. A black Girsan Model MC9 Semi-Automatic pistol;

xiii.    A black Beretta Model APX Semi-Automatic pistol;

xiv. A black Colt Model MKIV Series 70 Semi-Automatic pistol;

xv.  A black Smith and Wesson Model M&P 9C Semi-Automatic pistol;

xvi. A black Springfield Armory Model XD-45 Semi-Automatic pistol;

xvii.    A black Smith and Wesson Model Bodyguard Semi-Automatic pistol;

xviii.   A chrome Beretta Model 84F Semi-Automatic pistol;

xix. A black Glock Model 30 Semi-Automatic pistol;

xx.   A black Beretta Model Nano Semi-Automatic pistol;

xxi. A black Canik 55 TY Model TP9SA Semi-Automatic pistol;

xxii.    A black Glock Model 43X Semi-Automatic pistol;

xxiii.    A black Smith and Wesson Model 4013 Semi-Automatic pistol;

xxiv.    A black Springfield Armory Model XD-9 Semi-Automatic pistol;

xxv. A black Taurus International Model Millennium G2 Semi-Automatic pistol;

xxvi.    A black Glock Model 29 Semi-Automatic pistol;

xxvii.    A chrome Pietro Beretta Model 92FS Semi-Automatic pistol;

xxviii.   A black and wood Century Arms Model Micro VSKA Semi-Automatic pistol;

xxix.    A black and wood Romarm Model Draco Semi-Automatic pistol;

xxx. A black and wood Romarm Model Micro Draco Semi-Automatic pistol;

xxxi.    A black and wood Romarm Model Draco Black and wood Semi-Automatic pistol;

xxxii.    A black and wood Pioneer Arms Model Sporter Semi-Automatic AK Style rifle;

13

     xxxiii. A black Century Arms Model VSKA Semi-Automatic AK Style rifle;

     xxxiv. A black Romarm Model WASR-10 Semi-Automatic AK Style rifle;

     xxxv. A black Century Arms Model C39V2 Semi-Automatic AK Style rifle;

     xxxvi. A black Century Arms Model VSKA 7.62 Semi-Automatic AK Style rifle;

     xxxvii. A green Marcolmar Firearms Model CETME-L 5.56 Semi-Automatic Rifle;

     xxxviii. A black Combat Armory Model CA15 AR-15 Style Semi-Automatic rifle;

     xxxix. A black Smith and Wesson Model MP15 AR-15 Style Semi-Automatic rifle;

     xl. A black Bushmaster Model XM15-E25 black AR-15 Style Semi-Automatic rifle;

     xli. A black Stag Arms Model Stag-15 AR-15 Style Semi-Automatic rifle;

     xlii. A black Anderson Manufacturing Model AM-15 AR-15 Style Semi-Automatic rifle;

     xliii. A black Daniel Defense Model DDM4 AR-15 Style Semi-Automatic rifle;

     xliv. A black DPMS Inc. Model MOD A-15 AR-15 Style Semi-Automatic rifle;

     xlv. A black Daniel Defense Model DDM5V3 AR-15 Style Semi-Automatic rifle;

xlvi.    A gold and black PMG AR-15 Style Semi-Automatic rifle with no serial number (commonly referred to as a "ghost gun");

xlvii.    A black PMG Model AR-15 Style Semi-Automatic ghost gun rifle with no serial number;

xlviii.    Five black silencers; and

xlix.    Thousands of rounds of ammunition.

b.    LASD Detectives also found multiple firearm parts and accessories including a handgun case and various handgun magazines.

**F.    Additional Mirandized Statements Made by PINEDA**

30.    PINEDA was transported and booked at Century Regional Detention Facility (CRDF). Detective Moore contacted PINEDA in the CRDF interview room regarding the number of firearms recovered at PINEDA's residence. PINEDA told Detective Moore that he knew there were a lot of firearms in the garage but was unsure of the amount. PINEDA told Detective Moore that he holds some of them for people and when he is told to sell one to someone, he does. PINEDA said he will get a phone call from someone (though PINEDA would not elaborate) who would tell him a person would be contacting him to pick up a firearm or narcotics. When the customer contacted him, he would coordinate the transaction with them. PINEDA told Detective Moore the U.S. Currency was his but could not provide information regarding its origins.

### G.    PINEDA's Status as a Convicted Felon

31.  On November 6, 2024, I reviewed a California Law Enforcement Telecommunications System ("CLETS") criminal history report, a Los Angeles County Consolidated Criminal History Report System ("CCHRS") criminal history report and certified conviction records for PINEDA and learned that PINEDA has previously been convicted of a felony crime punishable by a term of imprisonment exceeding one year.

32.  Specifically, on or about October 21, 2001, PINEDA was convicted of Burglary, in violation of California Penal Code 459, in the Superior Court for the State of California, County of Los Angeles, Case Number YA049790.

33.  On or about October 21, 2001, PINEDA was convicted of Receiving Stolen Property, in violation of California Penal Code 496, in the Superior Court for the State of California, County of Los Angeles, Case Number YA049790.

34.  On or about October 31, 2002, PINEDA was convicted of Possession of Cocaine Base for Sale, in violation of California Health & Safety Code 11351.5, in the Superior Court for the State of California, County of Los Angeles, Case Number BA233170.

35.  On or about October 26, 2009, PINEDA was convicted of Felon In Possession of a Firearm, in violation of California Penal Code 29800, in the Superior Court for the State of California, County of Los Angeles, Case Number BA356909.

### H.    PINEDA possessed Short-Barrel Rifles and Silencers

36.    On September 25, ~~2004~~ 2024, Special Agent S. Larson measured three rifles seized from PINEDA that appeared to have a short barrel. Specifically, one Privately Made AR-15 type .223 caliber rifle bearing serial number Q4FMBUS8F, measured approximately 27 inches overall with a barrel length of approximately nine inches; one Privately Made AR-15 type .223 rifle bearing serial number Q4FMBUS8E, measured approximately 24 inches overall with a barrel length of approximately nine inches; one Anderson Manufacturing AM-15 rifle bearing serial number 20139282, measured 26 inches overall with a barrel length of approximately 11 inches. These measurements indicate the firearms examined and listed above have a barrel-length of less than 16 inches. In addition, these firearms are both "firearms" and "short-barreled rifles" as defined under Gun Control Act ("GCA") 18 U.S.C. § 921(a)(8) and the National Firearms Act ("NFA") 26 U.S.C § 5845(a)(3).

### I.    Review of Laboratory Test Results

37.    On November 6, 2024, I reviewed the report issued by the ATF Firearms Technology Criminal Branch Technical Examination Report. The ATF lab concluded that the silencers recovered from PINEDA's residence are each a device for silencing, muffling, or diminishing the report of a portable firearm; and therefore, are each a "firearm silencer" or "firearm muffler" as defined in 18 U.S.C. § 921(a)(25).

**J.    National Firearms Registration Transfer Record**

38.    On or about September 30, 2024, ATF SA J. Hammond reviewed the results of a records search of the National Firearms Registration and Transfer Record ("NFRTR") to determine if the short-barreled rifles were registered to PINEDA or any other person. The NFA NFRTR records revealed the firearms were not registered to PINEDA or any other person(s)/entities.

**K.    Interstate Nexus**

39.    From September 12, 2024, through October 17, 2024, ATF SA D. Gonzalez, an ATF Interstate Nexus Expert, examined the 57 firearms seized from PINEDA. 55 of the 57 total firearms seized have been confirmed to have been manufactured outside of the state of California.

**L.    Review of Laboratory Test Results**

40.    On November 6, 2024, I reviewed the following DEA Southwest Laboratory Chemical Analysis Report regarding the methamphetamine seized from PINEDA. The report revealed the methamphetamine seized by LASD totaling approximately 957.13 grams tested positive as Methamphetamine Hydrochloride with a net weight 889.3 grams and a purity of 100% resulting in 889.3 grams of pure substance/actual methamphetamine. The methamphetamine seized by LASD totaling approximately 8,683 grams tested positive as Methamphetamine Hydrochloride with a net weight 8,045.3 grams and a purity of 98% resulting in 7,884.3 grams of pure substance/actual methamphetamine. The methamphetamine seized by LASD totaling approximately 18,160 grams tested positive as Methamphetamine Hydrochloride with a

net weight 17,429 grams and a purity of 97% resulting in 16,906 grams of pure substance/actual methamphetamine.

### V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

41.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion

of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus

may be kept at a drug trafficker's residence even if the drug
trafficker lives with others who may be unaware of his criminal
activity.

      h.   It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as Blackberry
Messenger, WhatsApp, and the like, to cheap, simple, and often
prepaid flip phones, known colloquially as "drop phones," for
actual voice communications.

### VI.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

   42.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

      a.   Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept on digital devices.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VII.  __TRAINING AND EXPERIENCE ON DIGITAL DEVICES__[3]

1.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

2.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[3] As used herein, the term "digital device" includes the SUBJECT DEVICES and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

3.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

24

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    **CONCLUSION**

43.  For all of the reasons described above, there is probable cause to believe that PINEDA has committed violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 18 U.S.C. § 922(g)(1) (prohibited person in possession of a firearm), 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime), and 26 U.S.C. § 5861(d) (possession of an unregistered firearm). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 12th day of
November, 2024.

_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE